LINNIE FURMAN

*v.*

WILLIAM FRENCH HUNT, *Admr.*

(No. 10315)

Submitted April 10, 1951.   Decided May 1, 1951.

*Wm. French Hunt,* for plaintiff in error.

*Robert T. Donley, Hale J. Posten,* for defendant in error.

Fox, President:

For many years prior to her death, Eva B. McVicker, a widow, hereafter referred to as Mrs. McVicker, occupied as a tenant by sufferance, what is known as "The Mc-Vicker Home", in the outskirts of Morgantown. The home was a large and imposing one, very old, and for reasons easily understood, Mrs. McVicker did not keep the same in modern condition, not even installing gas and water facilities. The only improvement made was electrical current for lighting purposes only. She died testate in September, 1947, leaving her estate to two nieces who were nonresidents of this State, and William French Hunt was legally appointed and qualified as administrator with the will annexed, of the said estate, by the County Court of Monongalia County. She left an estate of about $14,-000.00. After her death, a sealed envelope was found among her papers containing securities of the value of about $8,000.00, on which there was a written notation "For Linnie Furman in case of my death", and signed "Eva B. McVicker". An unsuccessful attempt was made by Linnie Furman to probate this statement as a codicil to the last will and testament of Mrs. McVicker. See *Hunt* v. *Furman,* 132 W. Va. 706, 52 S. E. 2d 816. Following the decision of this Court in the matter of the attempted probate of said paper, she then prosecuted a claim, which had probably already been filed before a commissioner of accounts, against the estate of Mrs. McVicker, in the sum of $7,200.00 for services allegedly performed over a period of six years prior to the death of Mrs. McVicker, such charge being at the rate of $100.00 per month for all of said period. The claim was vigorously disputed by the administrator, and was referred to a special commissioner of accounts, testimony taken and papers filed, with the result that the commissioner found in favor of the claimant, Linnie Furman, in the sum of $4,871.00, which finding was upheld by the county court, affirmed by the Circuit Court of Monongalia County on appeal, and judgment entered therefor on May 5, 1950, to which judgment, at the instance of the administrator,

we granted this writ of error, and in this Court claimant assigns cross-error as to certain items.

In this vigorously contested proceeding a number of preliminary questions are raised which we think should be disposed of before considering the case on its merits. In the first place, the question is raised as to the jurisdiction of the County Court of Monongalia County, through its commissioner of accounts, to determine this disputed and unliquidated claim. We think this question has long been settled in this State. Section 24 of Article VIII of our Constitution, in conferring powers upon county courts, provides that:

"* * * They shall have jurisdiction in all matters of probate, the appointment and qualification of personal representatives, guardians, committees, curators, and the settlement of their accounts, and in all matters relating to apprentices. * * *"

The settlement of the accounts of personal representatives cannot be brought about without an ascertainment of the assets of the estate, and the indebtedness of the decedent, if any. The mere fact that a claim against an estate may be disputed does not bar the county court from passing upon the same in the first instance, although the question arising thereon may ultimately reach a court possessing full judicial power, on appeal. We have often held that county courts possess judicial power to the extent of probating wills, the appointment of personal representatives, and the settlement of their accounts. It is only in cases where title to property is at stake, or other intricate matters in which purely judicial questions arise, not necessarily involved in the settlement of accounts of personal representatives, that the aid of courts possessing judicial power is necessarily invoked. Code, 44-2, specifically provides for the filing of claims against decedents estates before a commissioner of accounts, for his making of a report thereon, and for action of the county court thereon, and this power has been often invoked as will be seen from the following cases decided

in recent years: *Garden* v. *Riley,* 116 W. Va. 723, 183 S. E. 46; *In Re Estate of Scott,* 122 W. Va. 352, 9 S. E. 2d 528; *Boone* v. *Boone,* 123 W. Va. 696, 17 S. E. 2d 790; *Ritchie* v. *Armentrout,* 124 W. Va. 399, 20 S. E. 2d 474; and *In Re Hauer's Estate,* 135 W. Va. 488, 63 S. E. 2d 713.

The settlement of the estate of Mrs. McVicker was referred to Ward B. Stone as a special commissioner of accounts for Monongalia County. Stone, it appears, had been a regular commissioner of accounts for said county, and his services as such had terminated after the Mc-Vicker estate had been committed to him for settlement. He was then appointed special commissioner of accounts to dispose of matters in his hands, and it is objected that such procedure was improper. We do not think this position is tenable. Code, 44-3-3, provides:

> "When, from any cause, none of the commissioners of accounts can act as to any matter or matters which may be passed on under the provisions of this chapter, such court or tribunal, as is mentioned in section one of this article, may appoint some other person to act as to such matter or matters, and such person shall have the power and compensation and perform the duties of a commissioner of accounts. And when any commissioner of accounts resigns, or is removed, such court or tribunal may provide for the completion of the matters previously referred to such commissioner."

We think this statutory provision fully sustains the power and authority of this commissioner of accounts to hear and determine the matters involved herein.

The matter of appraising claims made against the estate of a deceased person, especially those involving claimed personal services performed for a decedent while in life, is one which has vexed the courts from the foundation of the State. The importance of protecting estates against unjust claims is apparent, and it is so important that a statutory provision guarding against the same has been

enacted. Code, 57-3-1. Early in the history of the State, in the case of *Hurst's Adm'r.* v. *Hite, Adm'r.*, 20 W. Va. 183, this Court, in an effort to lay down a general rule covering cases of this character, held:

> "Where service is performed by one at the instance and request of another, and especially where that other is personally benefited by the service, the law implies a contract, that the party, who performs the service, shall be paid a reasonable compensation therefor, unless there be something in the relation of the parties or the circumstances of the case, which precludes the idea of such compensation; in which case there would be an implied agreement or understanding that no such compensation was to be paid."

Out of this holding has evolved the principle that where the person claiming compensation is a near relative of the person for whom the service is performed, it will be presumed to be gratuitous, and to overcome that presumption there must be a clear showing of a contract, express or implied, that compensation for the services should be paid. If such presumption is overcome by proof, then reasonable allowance for service is made. On the other hand, where there is no relationship between the parties, out of which the presumption of gratuitous service can reasonably arise, it is presumed that the person who performs service is to be compensated therefor. In *Shew* v. *Prince,* 119 W. Va. 524, 194 S. E. 345, we held:

> "Persons under neither legal nor moral obligation to maintain an aged individual are presumptively entitled to be paid from his estate, after his death, the reasonable worth of board, lodging, and essential service which they furnished him during the period of five years immediately preceding his death."

See also *In Re Fox' Estate,* 131 W. Va. 429, 48 S. E. 2d 1, in which it is said:

> "* * * It is an elementary rule * * * that wherever services are rendered and received, a contract of hiring or an obligation to pay compensation will generally be presumed. * * *"

There is, in this State, no presumption of payment during the lifetime of a decedent, and where the debt is established, or a contract, express or implied, to pay compensation is established, then the burden 'is on the estate of the decedent to show payment. These statements, we think, correctly state the law as applied to cases of this character. Usually the case presented is where a child or close relative either takes an old person into his home or goes to the home of the aged relative, looks after him in his declining years, or where no close relationship exists, an aged person is provided for either in his own home or elsewhere. The case before us is an unusual one, and the decisive point, as we see it, is whether the circumstances of the case do or do not preclude the idea of compensation.

The claimant, Linnie Furman, testified in this case, over the objection of the administrator, as to personal transactions between her and Mrs. McVicker, now deceased. Ordinarily this testimony would be incompetent under the provisions of Code, 57-3-1. The administrator testified in the case, and whether or not the scope of his testimony was sufficient to make competent the testimony of the claimant is a debatable question into which we will not enter, because we do not consider it important in the view we have taken of the whole case. Testimony was introduced as to the statements made by Mrs. McVicker concerning payments made to the claimant. Such of this testimony as was against her interests would be admissable, but others of such statements were probably self-serving. The objections to this character of testimony, and questions arising therefrom will be passed over, as immaterial on the vital and decisive question here presented. Our decision in this case rests upon the simple question of whether or not, from all the circumstances of the case, there was a contract, express or implied, between Mrs. McVicker and Linnie Furman, at the time the latter went to the McVicker home, that she was to receive compensation for the services she would render during the period she lived with Mrs. McVicker, begin-

ning in October, 1941, and ending in September, 1947. It is clear that there was no express contract between these two persons for compensation, and, therefore, the sole question to be determined is whether the evidence and circumstances of the case justify the holding that there was an implied contract for reasonable compensation for services performed or to be performed, and, in passing on this question, we consider statements made by the claimant, and Mrs. McVicker, as well as all of the other testimony in the case.

It is well to state at this point, that there appears to be no question but that the claimant lived with Mrs. McVicker practically all of the time between 1941 and 1947; nor that she performed services generally covered by ordinary housekeeping, and some attention to Mrs. McVicker during certain illnesses. When Mrs. McVicker was seriously ill, as occurred when she suffered a broken limb, she was taken to a hospital, and at other times hospital and nursing services were provided; but during ordinary times and ailments, the claimant looked after her. The evidence does not convince us that the services she performed were in the nature of those of a practical nurse, because, aside from the fractured limb, it appears that Mrs. McVicker was up and around to the extent that would be expected of a lady of her age. She was seventy-six years old in 1941, and claimant was sixty-seven. As we see the case, it is simply one of two old ladies living together in the same house and doing what little work was necessary to be done in keeping the home going, and, perhaps, looking after each other.

Linnie Furman, the claimant, testified that she went to the McVicker home in October, 1941, and that from that time on she did everything there was to do about the house. Her own expression is "Well, I just went there." She testified that there was no running water in the house, and that the water used was taken from a spring house about one hundred feet away. There were no sanitary facilities in the house, and coal was burned

to provide heat. She stated that Mrs. McVicker was ill most of the time while she was there. She was then asked: "Did you intend to render this service free of charge?", to which she answered: "No sir, I did not." She was then asked: "It was your expectation that you would be paid by her or from her estate?", to which she answered: "Yes sir, it was." She was then asked: "And have you been paid?", to which she answered: "No sir, I have not." All of these questions and answers were objected to. She was then asked: "Did she attempt to pay you after her death?", to which she answered: "Yes sir, she did. She told me she would remember me in her will." She was then asked: "Did she try to do something for you after her death?", to which she answered: "She gave me her postal savings and well you know, what are they called." This last statement evidently refers to the securities involved in the litigation which finally reached this Court, and in which she lost her suit. She then stated that $100.00 a month was a fair value of services she rendered. She also stated that Mrs. McVicker was pretty hard to get along with, and when asked: "Did she leave the impression with you generally that she had a lot of money or that she was hard up?", stated that: "She always talked as though she was hard up but she said she would remember me." When asked: "Did Eva McVicker attempt to pay you?", she replied: "No, she didn't; only just a little bit of change for bus fare or something like that." The claimant testified that she had known Mrs. McVicker all of her life.

Another witness, Virginia L. Yost, testified that she knew the parties and lived near the McVicker home. She testified in general as to the work performed by the claimant, and that $100.00 a month was reasonable compensation therefor. When asked: "Did Eva McVicker ever indicate to you an intention to pay Linnie Furman?", answered: "Yes, Eva indicated to me an intention to pay Linnie." Georgia Mildred Barnes testified as to the services performed by the claimant, and stated that the $100.00 per month was reasonable compensation for the work

performed. When asked if Mrs. McVicker had ever indicated her intention, with respect to paying Linnie Furman for her services, stated that she had not heard it discussed. Sidney E. Wells testified as to the work performed by the claimant. She was asked: "Did Eva ever indicate to you what financial arrangements she had with Linnie Furman?", to which she replied: "She told me she wasn't paying Linnie anything but she would like to." But she was unable to state when that statement was made with reference to her death. She also stated that she considered claimant's charge for service reasonable. Other witnesses testified as to the character of work performed by claimant, and that the charge she made was reasonable. No other statement respecting financial arrangements was made by witnesses introduced by the claimant.

C. P. Bungard, a witness introduced by the administrator, testified as to his long acquaintance with Mrs. McVicker. He testified as to his rather close acquaintance with her, for some eighteen years, and some knowledge of her financial situation. He testified that Mrs. McVicker stated to him while she was in the hospital that "At the time she was ill, she paid Linnie Three Dollars a week." He also stated that Mrs. McVicker stated to him: "She said Linnie had come because she didn't have a home, and had moved in with her, and that she herself didn't feel she could afford to keep Linnie. We all thought it was a satisfactory arrangement. That was my understanding the way it was." He also stated that when asked about the condition of Mrs. McVicker's health that she seemed to get around very well for a woman of her age, and that she had gone to a hospital twice, once when she had her hip broken, and another time for a hernia; that at one time a Mrs. Weaver acted as a practical nurse. When asked whether she had ever made any statement, as to any express or implied contract she had with Linnie Furman as to paying for her services, stated: "She was discussing about making the will at that time, discussing it from the standpoint of what is happening right now.

She wanted this avoided. She went on telling me what she intended to do with her money. I said, 'Linnie should have something.' She said, 'Yes, Linnie is to have a little something, but she isn't to have it all.' She said that, after all, her money was to go to the girls in Philadelphia, because they never received anything from the death of their father. She said, 'After all, blood is thicker than water.' I think the night after her death, someone asked me at that time what was to become of her estate. For eighteen years, I understood that was the way it was to be." She told James M. Campbell that: "She was sorry she couldn't pay her more, because Linnie had been so good to her.", but she mentioned no amount. Other testimony in the case shows that a practical nurse was employed for Mrs. McVicker on more than one occasion when she was ill, and about her being in the hospital, but there is no other testimony throwing any light on the question of whether compensation was to be paid to the claimant. We do not deem it important to go into detail as to this testimony.

The claimant was then called for further testimony. She denied that Mrs. McVicker had paid her $3.00 a week for services when she was ill, and testified that she never paid her any regular amount; that she gave her a little money, something like a dollar at a time every two or three months. She said, when asked: "Did you go to Eva McVicker's home asking for a place to live or did you go there at her request?", that: "I went there at her request."; and also stated that during the time she was living with her, the income of Mrs. McVicker was over $500.00 a year. Nelle J. Price, a niece of Mrs. McVicker by marriage, was then introduced, and testified to a conversation she had with her. She first testified that Mrs. McVicker had told her that Linnie had come to live with her, and when asked: "Did she make any statement as to what compensation she agreed to give Linnie?", replied: "She said—Mrs. McVicker said that she was willing to give Linnie a home and to board her or feed her, but she could not pay her very much, at

any rate, she wasn't able to pay her.", and that statement was made after the time claimant went to the home of Mrs. McVicker.

On this testimony, the commissioner of accounts reduced the claim of claimant from $7,200.00 to $4,871.00. He seems to have arrived at this sum by only allowing $100.00 a month for five years prior to the death of Mrs. McVicker, on the theory that the statute of limitation barred the claim beyond five years. He then further reduced the claim by allowing $729.00, to cover the $3.00 a week assumed by him to have been paid claimant, and deducting $400.00 to cover the time during the six year period when she rendered no service to Mrs. McVicker. There is no evidence in the case that Mrs. McVicker paid claimant $3.00 per week during all the time she lived with her, but there is testimony that Mrs. McVicker stated that she paid Linnie Furman $3.00 per week while she was ill. The payment of this sum during the entire period, or during the time Mrs. McVicker was ill, argues, of course, against the claim of claimant here asserted. The acceptance of that or any other sum during the years she lived with Mrs. McVicker tends to create the presumption that that was all that was intended to be paid. The report of the commissioner of accounts further complicates an already complicated situation.

Keeping in view the importance of protecting estates of decedents against claims of this character, we are of the opinion that we cannot hold that the evidence is sufficient to establish a contract, express or implied, between Mrs. McVicker and Linnie Furman, in 1941 or at any other time, that Linnie Furman was to be paid anything for the services she undoubtedly performed for Mrs. McVicker. She herself does not testify to any such contract, nor does any other witness. The testimony does show that Mrs. McVicker did pay claimant something during these years, and expressed her regret that she could not pay more. According to her statement, at times she paid as much as $3.00 per week, but only when she was ill. The evidence shows that her income was

more than $500.00 per year, which we construe as around that sum, out of which she would have to provide food, shelter, etc. for herself and Linnie Furman. It is quite evident that she would not have been able to pay claimant anything like the claim now asserted, without going into the principle of whatever property she possessed. Everything indicates that if there had been an intimation of the claim as now presented, the relationship between the two parties would have been terminated instantly. It is clear to us that Mrs. McVicker thought she was bestowing a favor on claimant by permitting her to live with her, and it seems rather clear to us that claimant accepted this status, although undoubtedly the hope grew that she would be remembered by Mrs. McVicker in her will. There is much in the case to indicate that Mrs. McVicker did intend to provide something for claimant in her will, but if she had that intention she did not take the necessary steps to put it into effect as this Court has held. That fact, we think, does not establish claimant's present contention. That contention is not that there was a contract for an interest in the estate of decedent, but an implied contract to be paid a reasonable sum which is shown to be $100.00 per month. The evidence as to any contract is too vague and indefinite to provide a basis for any character of contract, or to create any presumption that compensation was intended to be paid. The claimant, a woman of sixty-seven years of age, goes into the home of a lifetime acquaintance of seventy-six years of age. In doing so we assume claimant went there at the invitation of Mrs. McVicker, but that does not in itself imply a promise of compensation, or create any presumption. Nothing in the evidence indicates that claimant could have obtained employment in other work, and the strong inference is, from all the circumstances, that it was a wise step on her part to provide a home for herself at the expense of Mrs. McVicker, and that in return therefor, she was to do the household work which, in the very nature of things, could not have been heavy. All of the evidence indicates that there was an understanding between the parties that claimant live there,

receive very little for her work beyond her support, with the expectation on the part of claimant that Mrs. McVicker would do something for her by bequeathing her some part of her estate, which she may have intended to do. We think the relationship between the parties was based on companionship between two old acquaintances who found it congenial to live together; that it was for the benefit of both; and that the thought of substantial compensation, on a contractual basis, never entered the minds of either.

The intention on the part of Mrs. McVicker, if it ever existed, to provide something for claimant in her will was never legally executed, and does not justify the allowance of a claim, based on contract, such as is asserted in this case. The claim here is that claimant performed services for Mrs. McVicker at her request, and that a presumption exists that she was to be paid therefor. There is no claim that there was any contract by which claimant was to have a part of the estate of Mrs. McVicker after her death, and even if that claim were asserted, it is not established by the evidence. It may have been discussed between them, and Mrs. McVicker may have indicated some intent along that line to other people, but there is no precise and definite undertaking on her part which any court can enforce as a contract. A contract, whatever its nature, and whether express or implied, which affects an estate of a deceased person, must be established by clear and convincing evidence, and such evidence is not here present.

We do not mean to say that a person who performs services for another, with an agreement that he is to have a specific share or all of an estate may not, on failure to carry out such agreement, be entitled to fair compensation for services performed thereunder. We held in *In Re Estate of Scott, supra,* that:

> "One who is induced to and actually performs services upon the promise of another, that upon the death of the promisor her estate shall vest in the promisee as compensation for such serv-

ices, is, upon the breach of such promise, created by the death of the promisor without the conveyance, devise or bequest of her estate to the promisee, entitled to recover from the estate of the promisor the value of such services, performed subsequent to such promise, and the statute of limitations does not begin to run against the claim for recovery until the death of the promisor."

The facts in the *Scott* case are far removed from the facts in the case at bar. There is here no clear and convincing proof of any contract as in the *Scott* case. To permit her claim to be established, under the showing in this case, would be to let down the bars which now protect estates in a great measure from unjust claims. We do not characterize the claim urged by the claimant as altogether unjust. We simply say that the evidence and circumstances of this case do not justify this Court in affirming the order appealed from. We hold that no contract was made between Mrs. McVicker and claimant, under which any allowance of compensation can now be made to the latter.

We, therefore, reverse the judgment of the Circuit Court of Monongalia County, remand the proceeding with directions to overrule the report of the commissioner of accounts, and the order of the County Court of Monongalia County, allowing any sum to the claimant, and to enter an order in said court denying any relief to the claimant. The costs of this proceeding to be paid out of the estate of Eva B. McVicker.

*Reversed and remanded with directions.*